IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                   No. 20-cr-1284 KG

JACOB EARL STEWART,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant Jacob Earl Stewart's Motion for New Trial. (Doc. 101). Mr. Stewart was convicted by a jury of one count of conspiracy to transport an illegal alien and two counts of transporting an illegal alien in violation of 8 U.S.C. § 1324. Jury Verdict (Doc. 85). In his motion for new trial, Mr. Stewart generally challenges the sufficiency of the evidence. Having considered the Motion, the response, the trial transcript, and the evidence in the record, the Court denies the Motion.

*I.    Background*

On or about October 4, 2019, Defendant Jacob Earl Stewart drove his van with passenger Adrian Valles about 40 miles from Tornillo, Texas, to downtown El Paso. Apr. 27, 2021 Tr. ("Apr. 27 Tr.") (Doc. 98) at 165. Meanwhile, under cover of pre-dawn darkness, sisters Lisbeth Zaragoza-Campos and Liset Castillo-Campos, entered the United States without permission under a border fence at Chamizal Park in downtown El Paso. *Id.* at 44–45; Apr. 28, 2021 Tr. ("Apr. 28 Tr.") (Doc. 97) at 22. The sisters had paid someone in Mexico $2,000.00 to help them enter the United States and get to their family in Miami, Florida. Apr. 27 Tr. at 37, 42. They were told that someone would meet them to help them once they crossed the border. *Id.* at 45.

Mr. Valles testified that Mr. Stewart received a phone call with a request to pick up and transport two illegal aliens in El Paso. *Id.* at 161–162. Mr. Valles also testified that Mr. Stewart recruited Mr. Valles to accompany him and help communicate because Mr. Stewart does not speak Spanish. *Id.* at 162–163. Mr. Valles stated that he knew what he was doing—picking up illegal aliens—and that he had been told by Mr. Stewart's contact that they would get paid for doing it. *Id.* at 173, 176.

During their drive to El Paso, Mr. Valles answered a call from someone checking that he and Mr. Stewart were on their way to pick up the aliens and then making a three-way call with the two aliens to confirm they would be picked up soon. *Id.* at 166–167. While the two women waited on a park bench, Ms. Zaragosa-Campos received a call and spoke to someone in Spanish who told them not to worry and that "they're going to pick us up and that they're going to help us." *Id.* at 47, 49. According to testimony from Homeland Security Investigations (HSI) Special Agent Rene Robles (Agent Robles) and cell phone evidence, multiple WhatsApp calls were made between Mr. Stewart and Ms. Zaragoza-Campos. Apr. 28 Tr. at 59–61; Gov't Exh. 6 (image) (admitted without objection at Apr. 27 Tr. at 55).[1]

Shortly after the call, Mr. Stewart and Mr. Valles arrived at the park to pick up the two women and walked them back to the van. Apr. 27 Tr. at 56. Ms. Zaragoza-Campos and Ms. Castillo-Campos spoke no English. *Id.* at 58. Chamizal Park, according to Agent Robles, is "an area frequently exploited by human smuggling organizations" due to its proximity to the border, the vulnerabilities of a nearby port of entry, and the size of the park and ease of hiding in it. Apr. 28 Tr. at 66.

---

[1] Unless otherwise noted, all exhibits referenced herein were pre-admitted at the pre-trial conference, by stipulation of the parties. Tr. (Doc. 65) at 4.

Mr. Stewart drove the group of four to a Burger King in downtown El Paso. Apr. 27 Tr. at 59, 95. Along the way, Mr. Valles demanded cash from the two women while he held or licked his pocketknife. *Id.* at 58, 176. Liset Castillo-Campos then gave him $200 in cash from her fanny pack. *Id.* at 58–59; Apr. 28 Tr. at 24–25. At the Burger King, Mr. Stewart left the car to purchase breakfast while the sisters waited with Mr. Valles with the doors locked. Apr. 27 Tr. at 59, 95. As they ate, Mr. Stewart took a photo on a phone of himself and the two women. *Id.* at 60; Apr. 28 Tr. at 26; Gov't Exh. 12 (photo). Mr. Stewart then drove the group to nearby Sunland Park, New Mexico, about 20 miles away, where he was instructed to deliver the two women by his contact, according to Mr. Valles. Apr. 27 Tr. at 175.

In Sunland Park, Mr. Stewart arrived at what he thought was his destination and walked into an open house, only to realize the person there, Yolanda De La Cruz, was terrified to see him and demanded he leave. Apr. 27 Tr. at 109–110. Mr. Stewart then walked across the street and knocked, inquiring of that resident, "Are you expecting me?" *Id.* at 133, 140. She was not. *Id.* at 182–183.

Mr. Stewart eventually found his way to the residence of Willie Espinoza and Judith Clouser and drove through the gate. *Id.* at 183–184. There, he met with some men outside while Mr. Valles and the sisters waited in the van. *Id.* at 70, 184. Mr. Stewart was directed down the street to the home of Adrian Acevedo. *Id.* at 186. Mr. Stewart and Mr. Valles dropped off the two women there and Mr. Valles instructed them to run into the house. *Id.* at 74. Either there or at the first stop, Mr. Stewart and Mr. Valles witnessed Ms. Zaragoza-Campos' and Ms. Castillo-Campos' belongings being taken away by the men. *Id.* at 188 (Mr. Valles' testimony that the sisters' things were taken at Mr. Acevedo's house), 70 (Ms. Zaragoza-Campos' testimony that

her things were taken at Mr. Espinoza's house); Apr. 28 Tr. at 30 (Ms. Castillo-Campos' testimony that her things were taken at Mr. Espinoza's house).

Mr. Stewart and Mr. Valles returned to Willie Espinoza's home, according to testimony from Mr. Valles, where Mr. Stewart inquired about their expected $200 payment. Apr. 27 Tr. at 191–192. Mr. Valles testified that Mr. Espinoza sent them away without payment because, by that time, police were driving the neighborhood based on a call from Ms. De La Cruz about Mr. Stewart walking into her home. *Id.* He further testified that Mr. Espinoza said he would find a way to pay them later. *Id.*

The Sunland Park Police observed Mr. Stewart and Mr. Valles leaving Mr. Espinoza's house. *Id.* at 127. Because Mr. Espinoza was known to the police for being involved in the drug trade and burglaries, and because the red van matched the description given by Ms. De La Cruz, the police pulled Mr. Stewart and Mr. Valles over and questioned them separately. *Id.* at 127, 130–131. Mr. Stewart invoked his right to not allow his vehicle to be searched. *Id.* at 142. When asked who he had been looking for, Mr. Stewart answered "[Mr. Valles's] cousin" and then "well it's not his cousin, it's his girlfriend's sister, I think" and then "we're just out in El Paso." Gov't Exh. 12 (Lapel Camera Video) at 1:59–2:20. Pushed for what they were doing at Mr. Espinoza's house, Mr. Stewart replied, "I think we've reached an impasse in our discussion, like it's getting circular. I've tried to explain." Gov't Exh. 12 (Lapel Camera Video) at 3:20–3:30. He never mentioned to police that he had dropped anyone off. Apr. 27 Tr. at 139.

For his part, Mr. Valles told police that they had been going to see his friend, Ruben Espinoza. *Id.* at 175–176, 187. Mr. Valles testified that "I gave [the police] a false name because I didn't—I knew what we were doing, so I just gave them whatever statement so they could leave us alone." *Id.* at 187.

Ms. Zaragoza-Campos and Ms. Castillo-Campos were held at the house of Willie Espinoza and Judith Clouser for a few days while Mr. Espinoza and Ms. Clouser demanded more money from their family. *Id.* at 77–79. When the two women got access to their phones, they asked their family to call the police, who arrived to find the women running out the front door towards them. *Id.* at 78–79. Mr. Espinoza, Ms. Clouser, Mr. Valles, and Mr. Stewart were arrested for their roles in transporting and harboring the women. Ms. Zaragoza-Campos and Ms. Castillo-Campos agreed to serve as material witnesses in return for work authorization. *Id.* at 80–81; Apr. 28 Tr. at 38–39, 46–47. Ms. Clouser and Mr. Valles both agreed to testify after pleading guilty to their respective crimes. Apr. 27 Tr. at 221–222, 181.

Ms. Clouser testified that she and Mr. Espinoza had met with Mr. Stewart twice previously and that on the day he drove the two women, she was expecting Mr. Stewart to deliver two Cuban women to her house. *Id.* at 212–214, 217. Ms. Clouser also testified that Mr. Stewart expected to get paid in the range of $500 to $1000 for dropping off the women. *Id.* at 227–228.

At the close of the Government's case, Mr. Stewart motioned for acquittal under Fed. R. Crim. P. 29, and the motion was denied. Apr. 28 Tr. at 88, 91. The jury convicted Mr. Stewart on all three counts. Jury Verdict (Doc. 85).

## II.   Legal Standard

Fed. R. Crim. P. 33(a) permits a new trial "if the interest of justice so requires." Motions for new trial are committed to the sound discretion of the trial court. *See, e.g.*, *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *Royal College Shop, Inc. v. Northern Ins. Co.*, 895 F.2d 670, 677 (10th Cir. 1990). The court has broad authority to weigh

the evidence and consider the credibility of the witnesses. *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994).

The remedy, however, is "regarded with disfavor." *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999). The court should grant a new trial "only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1126 (10th Cir. 2009) (citing *United States v. Evans*, 42 F.3d 586, at 593). Put another way, a new trial is warranted where the verdict is "contrary to the weight of the evidence such that a miscarriage of justice may have occurred." *Evans*, 42 F.3d at 593.

*III.   Discussion*

Mr. Stewart argues that the "evidence presented at trial failed to prove beyond a reasonable doubt the scienter requirements" for both the conspiracy and transportation charges. (Doc. 101) at 2–3. Additionally, Mr. Stewart argues that the government's witnesses gave contradictory testimony and that the case against him suffers from a "lack of investigation." (Doc. 101) at 4–6. The Court addresses each issue in turn.

*A.  Sufficiency of Evidence for Count I, Conspiracy to Transport Illegal Aliens*

As the Court instructed the jury, in order to convict the Defendant of conspiracy to transport illegal aliens, the Government had to prove the following elements beyond a reasonable doubt: (1) that two or more persons agreed to violate the federal immigration laws; (2) that the Defendant knew the essential objective of the conspiracy; (3) that the Defendant knowingly and voluntarily involved himself in the conspiracy; and (4) that there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged. Jury Instr.

(Doc. 86) at 7; 8 U.S.C. § 1324(a)(1)(A)(b)(I); *United States v. Rahseparian*, 231 F.3d 1267, 1272 (10th Cir. 2000).

Mr. Stewart, in support of his contention that the scienter requirement was not proven, argues specifically that "no credible evidence proving that Mr. Stewart knew anything at all about that conspiracy...was presented at trial." (Doc. 101) at 4. This Court construes the argument as implicating the second and third elements specifically.

Knowledge of a conspiracy need not be proven directly; rather, a jury may "infer an agreement constituting a conspiracy from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." *United States v. Scull*, 321 F.3d 1270, 1282 (10th Cir. 2003). The jury is also permitted to presume "a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy." *Id.*

The Court concludes sufficient evidence existed for a jury to presume Mr. Stewart was a knowing participant in conspiracy to transport Ms. Zaragoza-Campos and Ms. Castillo-Campos. It is not disputed that Ms. Zaragoza-Campos and Ms. Castillo-Campos entered the United States illegally or that Mr. Stewart and Mr. Valles transported the two women from El Paso to Sunland Park. In addition to those facts, Mr. Valles testified that Mr. Stewart was contacted with an opportunity to transport illegal aliens for money and subsequently recruited Mr. Valles to join, and that both men communicated with an intermediary who told them where to pick up the two aliens and where to take them. Ms. Clouser testified that she and Willie Espinoza had met previously with Mr. Stewart. Ms. Zaragoza-Campos and Ms. Castillo-Campos testified that Mr. Stewart and Mr. Valles did not let them out of the car and instructed them to run inside

Acevedo's house. Finally, Mr. Stewart and Mr. Valles both declined to tell the police that they had been dropping two women off in Sunland Park.

Compare those facts with those in *United States v. Franco-Lopez*, another conspiracy to transport illegal aliens case. 709 F. Supp. 2d 1152 (D.N.M. 2010), *aff'd*, 687 F.3d 1222 (10th Cir. 2012). In *Franco-Lopez*, an alleged coconspirator testified that the defendant engaged in telephone conversations with other people involved in a smuggling venture. *Id.* at 1154. An admitted illegal alien testified that he was picked up by the defendant in a van about a half mile from the border near Sunland Park, New Mexico. *Id.* at 1156. And a Border Patrol agent testified that the defendant and the alleged coconspirator attempted to flee from Border Patrol agents who stopped their van. *Id.* The trial court concluded that the jury could infer from that testimony that there was a scheme involving multiple actors, that the jury could conclude those actors knew of the illegality of their actions, and that there was sufficient evidence to sustain a conviction for conspiracy to transport illegal aliens. *Id.* at 1158.

Here, as in *Franco-Lopez*, a reasonable jury could conclude from the evidence and reasonable inferences drawn therefrom that Mr. Stewart knew what he was doing was illegal, knew that he was indeed transporting illegal aliens, and knew of the conspiracy among the other actors to cooperate in transporting and harboring the aliens. Thus, sufficient evidence exists to support Mr. Stewart's conviction on Count I.

B. *Sufficiency of Evidence for Counts II and III, Transporting Illegal Aliens*

Mr. Stewart was convicted of two counts of violating 8 U.S.C. § 1324(a)(1)(A)(ii), which makes it illegal for

> [a]ny person who… knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.

The Court instructed the jury that in order to find Defendant guilty of transporting an illegal alien, the Government must prove beyond a reasonable doubt that: (1) each transported alien was, in fact, an alien; (2) each alien was present in the United States unlawfully; (3) the Defendant knew, or recklessly disregarded the fact, that each alien was not lawfully present in the United States; and (4) the Defendant transported or moved, or attempted to transport or move, each alien, intending to help her remain in the United States illegally. Jury Instr. (Doc. 86) at 11, 13; 8 U.S.C. § 1324(a)(1)(A)(ii).

Mr. Stewart does not dispute that the Government proved Ms. Zaragoza-Campos and Ms. Castillo-Campos were aliens present in the United States unlawfully. Mr. Stewart contends the "scienter" requirement was not proved and argues specifically that "no credible evidence proving that Mr. Stewart ... intended to help the women stay in the United States illegally was presented at trial." (Doc. 101) at 2–3, 4. This Court construes Mr. Stewart's Motion as putting the last two elements—knowledge of alien's illegal status and acting in furtherance of that crime—at issue.

*1. Defendant Knew or Recklessly Disregarded the Illegal Status of the Aliens*

Regarding the "knowledge" element, the Court notes first that knowledge—or, scienter, the more formal term Mr. Stewart uses—is not the required mens rea for transporting illegal aliens. Actual knowledge is not required. Rather, under Section 1324(a), the Government need only show that a defendant transported an alien with "reckless disregard" of the fact that a person was an illegal alien. 8 U.S.C. § 1324(a)(1)(A)(ii).

This Court instructed the jury that "reckless disregard" means "deliberate indifference to facts which, if considered and weighed in a reasonable manner, indicate the highest probability that the alleged alien was in fact an alien and was in the United States unlawfully." Jury Inst. (Doc. 86) at 11, 13; *United States v. Uresti-Hernandez*, 968 F.2d 1042, 1046 (10th Cir. 1992).

9

Mr. Valles testified that Mr. Stewart was in communication with an intermediary who promised payment in return for transporting illegal aliens. And Ms. Clouster testified that she expected Mr. Stewart to deliver two women and expected to pay him for it. The jury could reasonably infer that Mr. Stewart had actual knowledge that Ms. Zaragoza-Campos and Ms. Castillo-Campos were aliens.

But even if the Court accepted Mr. Stewart's argument that his knowledge was not directly proven, the jury heard sufficient circumstantial evidence. Mr. Stewart, for example, was in the car during a phone call arranging the sisters' pickup. He picked up Ms. Zaragoza-Campos and Ms. Castillo-Campos at the border, in a specific location known for smuggling, in the early morning hours. He did not allow the sisters to leave his car or remain there unattended. He watched Mr. Valles demand $200 cash from them. He spoke with men who directed he take the women to an unknown house and who took the sisters' belongings in front of him. And when it came time to drop them off, he and Mr. Valles instructed them to run into the house. Finally, Mr. Stewart and Mr. Valles declined to tell police they had been driving strangers to Sunland Park.

This evidence is sufficient to demonstrate a reckless disregard to facts which indicate Ms. Zaragoza-Campos and Ms. Castillo-Campos were unlawful aliens. *See, e.g.*, *United States v. Perez-Gomez*, 638 F.2d 215, 218-19 (10th Cir. 1981) (concluding evidence of defendant's concern that aliens be kept secreted to avoid suspicion was sufficient to prove that defendant knew aliens were in United States in violation of law); *United States v. Mussaleen*, 35 F.3d 692, 694, 698 (2d Cir. 1994) (finding defendant was not "providing lawful service as a driver for hire" and "may properly be convicted under a statute that permits reckless disregard to satisfy the mens rea element of the crime" where he was aware of conspiracy to support an alien with illegal

entry, picked her up at airport and drove her around to various locations over three days); *United States v. Romero-Cruz*, 201 F.3d 374, 379 (5th Cir. 2000) (considering in part that aliens were picked up by defendant in area "known for alien smuggling" and "were clearly in transit and attempting to hide" to establish knowledge of illegal status).

The Court concludes that the direct and circumstantial evidence presented in the Government's case in chief was sufficient to prove that Mr. Stewart knew or recklessly disregarded the fact that Ms. Zaragoza-Campos and Ms. Castillo-Campos were in the United States illegally.

    *2. Defendant Transported Aliens in Furtherance of Their Unlawful Presence*

Mr. Stewart also claims that he did not intend to help the women stay in the United States illegally, which language comes from the last element of the crime as described in the jury instructions. The intent element comes from the "in furtherance of" clause of § 1324(a)(1)(A)(ii). The Tenth Circuit previously considered that clause of the statute and made clear that specific intent is not necessary. Instead,

> the element is sufficiently broad to encompass any person who acts, regardless of profit motive or close relationship, with knowledge or with reckless disregard of the fact that the person transported is an illegal alien and that transportation or movement of the alien will help, advance, or promote the alien's illegal entry or continued illegal presence in the United States.

*United States v. Barajas-Chavez*, 162 F.3d 1285, 1288 (10th Cir. 1999). The Tenth Circuit explicitly rejects a focus on the defendant's intent, as other circuits have chosen to do; instead, a factfinder may consider any and all relevant evidence bearing on the "in furtherance of" element. *Id.* at 1289. Reflecting that broad definition, this Court instructed the jury to consider "all relevant evidence, including the time of the trip, place, distance of the intended trip, reason for the trip, the overall impact of the trip, and defendant's role." Jury Instr. (Doc. 86) at 11, 13.

11

In this case, the trip began in the early morning. Mr. Stewart picked up the two women along the border. He drove them away from the border and away from border checkpoints to a private home where they did not know anyone. The women believed they were being taken to people who could help them get to their family in Miami. As discussed above, there was evidence that Mr. Stewart either knew or recklessly disregarded the fact that they were present in the United States illegally.

This Court concludes the facts and circumstances of this case fall well within the broad standards set by the Tenth Circuit. In *Barajas-Chavez*, the Court upheld a conviction of a driver caught at a checkpoint with two illegal aliens—all three of whom were travelling together to Denver in search of work. 162 F.3d at 1289–1290. The Court found the "in furtherance of" element sufficiently met merely by the fact that the driver "planned, organized, and attempted to carry out" the trip which would "arguably have assisted the aliens in evading immigration authorities by relocating them to a city much farther from the United States–Mexico border." *Id.*

In a subsequent case, *United States v. Hernandez*, a semi-truck driver was caught with illegal aliens in the sleeper compartment of his truck at a border checkpoint on I-25 on a trip from El Paso to Albuquerque. 327 F.3d 1110 (10th Cir. 2003). Though the defendant claimed he picked up the aliens as hitch hikers and did not know they were illegal aliens, and the district court agreed, finding the driver lacked intent under the "in furtherance of" element, the Tenth Circuit again reinstated the jury verdict. *Id.* at 1111. The Court reasoned that "once an illegal alien has crossed the border, he, or she, has an understandable desire to get as far away from the border as quickly as possible," which was enough to show that the driver, in reckless disregard of aliens' illegal status, transported them in furtherance of such violations. *Id.* at 1113.

Based on the evidence and testimony presented at trial, a reasonable jury could find that Mr. Stewart transported Ms. Zaragoza-Campos and Ms. Castillo-Campos with the intent to help them remain in the United States illegally, or at the very least that he transported them with reckless disregard of their illegal status and that his transporting them helped further their illegal presence in the United States.

*C. Conflicting Testimony*

Mr. Stewart argues that the case against him suffers from "contradictory" witness testimony. (Doc. 101) at 4. The Court agrees with Mr. Stewart that there are certain facts on which Mr. Valles gave testimony in conflict with that of other witnesses: whether Mr. Valles had met Ms. Clouser previously; whether Mr. Valles licked his knife or merely held it; whether the sisters' belongings were confiscated at the first house or the second; whether the second house was messy or clean; the precise date on which the delivery occurred.

Mr. Stewart, however, does not provide any authority showing that inconsistent testimony is, on its own, sufficient to merit a new trial. The Court concludes that the conflicts presented have peripheral significance to the case, and that the Court should leave the verdict undisturbed where the jury was able to make credibility determinations and weigh the evidence as it saw fit. *See, e.g., United States v. Sanchez*, 969 F.2d 1409, 1415 (2d Cir. 1992) (concluding that "insignificant" inconsistencies in officers' testimony "presented a credibility question for the jury, at most" and reversing trial court's granting of new trial).

Treating the conflicting testimony as part of Mr. Stewart's insufficiency of the evidence argument, the Court concludes that sufficient evidence was presented at trial to sustain the convictions.

*D. Insufficient Investigation*

Mr. Stewart argues that the case against him suffered from a "lack of investigation." (Doc. 101) at 4. Mr. Stewart specifically argues that HSI initiated search warrants for vehicles and did a phone dump of the two victims, but never did the same for him. *Id.* at 6. Mr. Stewart does not describe any evidence of an exculpatory nature that additional investigation would have revealed. Further, he does not cite to any authority for the proposition that an insufficient investigation independently warrants a new trial. As discussed above, the Court concludes sufficient evidence was presented at trial such that a reasonable jury could have—and in fact did—find Mr. Stewart guilty.

*IV.   Conclusion*

Having weighed the evidence and considered the credibility of the witnesses, the Court concludes the evidence does not preponderate against the verdict such that a miscarriage of justice has occurred. This is not the exceptional case which mandates a new trial.

IT IS, THEREFORE, ORDERED that Mr. Stewart's Motion for New Trial (Doc. 101) is DENIED.

_____
UNITED STATES DISTRICT JUDGE